John A. Bailey, Jr. (ISB No. 2619)
HAWLEY TROXELL ENNIS & HAWLEY LLP
412 W. Center Street, Suite 2000
P.O. Box 100
Pocatello, Idaho 83204
Telephone:  208-233-2001
Facsimile:  208-232-0150
Email:  JBailey@hawleytroxell.com

Stephen P. Withee (OH Bar No. 69176)
John S. Higgins (OH Bar No. 68156)
FROST BROWN TODD LLC
10 West Broad Street
One Columbus Center, Suite 2300
Columbus, Ohio 43215
Phone: (614) 559-7265
Facsimile: (614) 464-1737
Email:  swithee@fbtlaw.com and jhiggins@fbtlaw.com
*Pro Hac Vice Applications Pending*

*Attorney for Plaintiff VNS Federal Services, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| VNS FEDERAL SERVICES, LLC., <br><br> Plaintiff, <br><br> vs. <br><br> PORTSMOUTH MISSION ALLIANCE, LLC., <br><br> Defendant. | Case No.: _____ <br><br> **VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTION** |

For its Verified Complaint for Declaratory Judgement and Preliminary and Permanent Injunctive Relief, Plaintiff VNS Federal Services, LLC (VNSFS) states as follows:

## PARTIES, JURISIDICTION AND VENUE

1.     VNSFS is a Delaware limited liability company with its principal place of business in Richland, Washington.  VNSFS provides support services to sites operated by the United States Department of Energy as both a prime contractor and subcontractor.  These services include physical security, information technology support, records keeping, cybersecurity, and nuclear and hazardous waste management.

2.     Portsmouth Mission Alliance, LLC (PMA) is an Ohio limited liability company with its principal place of business in Piketon, Ohio.  PMA is a joint venture formed for the purpose of providing infrastructure support services at the United States Department of Energy's Gaseous Diffusion Plant in Piketon, Ohio.

3.     Jurisdiction is proper under 28 U.S.C §1332 as the amount in controversy exceeds $75,000, exclusive of costs and interests, and this action is between citizens of different states.

4.     This Court has the power to grant the relief sought in this action pursuant to 28 U.S.C. §2201.

5.     Venue is proper pursuant to the venue selection clause contained in VNSFS' subcontract with PMA which provides litigation shall be brought in Federal District Court with venue in the United States District Court for the District of Idaho.

## FACTUAL BACKGROUND

6.     The Department of Energy operates a gaseous diffusion plant in Piketon, Ohio at which it enriched uranium for use in the United States nuclear arsenal.  DOE ceased enriching uranium at the facility and is in the process of decontaminating and decommissioning (D&D) the plant through a separate contract.  The D&D work is the principal activity at the Piketon facility.

7.     In early 2015, the U.S. Department of Energy issued solicitation No. DE-SOL-0006421 for the Portsmouth Infrastructure Support Services Contract in Piketon, Ohio (the "ISS Work").  The general purpose of the ISS Work is to provide all the support services required by the D&D contractor – from physical security of the facility to janitorial services.

8.     North Wind, LLC and Smith & Staley, Inc. formed PMA as a joint venture for the purposes of pursuing the ISS Work.

9.     Wastren Advantage, Inc. (WAI) was a corporation that provided site support services to DOE sites around the country, including the facility in Piketon.

10.    On February 26, 2015, PMA entered into a teaming agreement with WAI under which WAI would utilize its expertise and experience at the Piketon site in support of PMA's proposal for the ISS Work.  In exchange for this assistance, PMA agreed that WAI would act as a major subcontractor for the ISS Contract.

11.    DOE accepted PMA's proposal and entered into a fixed price contract with PMA for the ISS Work memorialized as Prime Contract No. DE-EM000-4062 (the "Prime Contract").

12.    On April 14, 2016, PMA and WAI entered into Subcontract No. PMA-S.07 under Prime Contract No. DE-EM000-462 (the "Subcontract", attached as Exhibit A).  This was a fixed price subcontract for three separate scopes of work.  As additional compensation, PMA and WAI agreed to share in the fee which PMA received from DOE under the prime contract.

13.    Under the terms of the subcontract, WAI was responsible for three major scopes of work:

a.    *Safeguards and Security (S&S)*:  This included physical security, program management operations, and personnel security (e.g., individual security clearances);

b. *Computing, Telecommunications and Cyber Security*:  Here, WAI provided IT support, cyber security services, and telecommunications support.

c. *Records Management and Document Control*:   Under this scope of work, WAI was generally responsible to maintain, manage and dispose of the documents created at the Piketon site.

14.    In March 2018, VNSFS purchased the stock of WAI and assumed WAI's responsibilities under the subcontract.

15.    In June 2018, PMA assumed the Safeguards and Security scope of work from VNSFS after lengthy negotiations.  This reduction in scope also resulted in a modification of the fee sharing arrangement by which PMA increased its fee and reduced the amount shared with VNSFS.

16.    VNSFS' remaining scope consisted of the IT/cybersecurity and records management functions.  Of these remaining scopes of work, cybersecurity was the smallest and represented only approximately ten percent of the overall value of the work.

17.    In early 2019, DOE informed PMA and VNSFS that representatives from DOE's main office in Washington, DC would be performing a review of the cybersecurity systems at the Piketon facility in April.

18.    Starting in February 2019 PMA and VNSFS worked together to prepare for this review.  Representatives from both companies regularly met to discuss what may be expected and how potential items may be handled.

19.    Even prior to the notice of the audit, PMA had full knowledge of the status of the cybersecurity system.  PMA previously changed the cybersecurity reporting structure so that VNSFS' cybersecurity employees no longer reported to VNSFS management.  Instead, they

**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTION – Page 4**

reported directly to PMA's project manager, Damon Detillion.  In doing so, PMA took active control of the cybersecurity function.

20.     PMA also knew of the current status of the cybersecurity system through the reports VNSFS submitted in the Risk Tracking System.  VNSFS would enter issues that arose during operations into the Risk Tracking System and suggest possible fixes to PMA.  Such fixes would be implemented upon PMA's approval.  The Risk Tracking System would also be used to monitor the progress on any remediation.  PMA, therefore, was intimately familiar with the cybersecurity system.

21.     DOE conducted its review between April 15 and 17, 2019.

22.     On April 18, 2019 DOE conducted a debriefing to outline its findings.  That review identified twelve items that required correction.  These ranged from clarifying written procedures to software repairs on discrete elements of the system to address vulnerabilities.  DOE requested a Corrective Action Plan to address these concerns.

23.     Following the debriefing, PMA and VNSFS met to create the Corrective Action Plan.  The plan outlined the specific short, medium, and long-term steps to be taken for each item along with a timeline to complete the tasks.   VNSFS, with PMA's assistance, created a spreadsheet of the outstanding items and a general description of the work needed to resolve each.  (See Exh. B)

24.     PMA brought in Gregg Opperman, a project manager from outside PMA, to put a schedule together for these remediation efforts (the "PMA Recovery Schedule"; Exh. C).  The PMA Recovery Schedule showed complete resolution of the issues raised by DOE would take an average of 214 days.  While many of the short- and medium-term milestones would take much less time, PMA understood the time it would take to address the issues.  Upon information and

belief, the time frames in the PMA Recovery Schedule were incorporated into the Corrective Action Plan.

25.     On April 23, 2019, PMA notified VNSFS that it engaged an outside cybersecurity consultant to review the issues raised in the debrief by DOE and demanded VNSFS cooperate with this consultant.  VNSFS provided the requested cooperation and sought a copy of the consultant's findings.  PMA refused to provide this information.

26.     Throughout April and May, VNSFS worked with PMA to complete the Corrective Action Plan and cooperated with PMA's outside consultant.

27.     VNSFS also began work to address the short-term milestones in the PMA Recovery Schedule.  PMA knew of VNSFS' efforts.

28.     While VNSFS worked to resolve the issues raised by DOE, PMA began concocting its scheme to improperly terminate VNSFS.

29.     Upon information and belief, PMA entered negotiations with Leidos for Leidos to replace VNSFS as its subcontractor.  Leidos did not, to the best of VNSFS' knowledge hold any contracts or subcontracts at the Piketon facility.  Upon information and belief, these discussions resulted in a subcontract between PMA and Leidos.

30.     On May 20, 2019 and without any notice to VNSFS, Leidos began posting job openings for IT and cybersecurity positions at the Piketon facility.  (See Exh. D)  These jobs were held by VNSFS employees at the time.

31.     On May 21, 2019, the day after Leidos began posting its jobs, PMA sent VNSFS a Notice of Default for the subcontract. (See Exh. E)

32.     This Notice claimed VNSFS was in default based on the findings of DOE's review and demanded VNSFS cure twelve items within ten days.

33.     PMA indicated that if these twelve items were not cured by May 31, 2019 PMA would terminate the entire subcontract – including the general IT services and records management work for which there has been no finding of inadequacy.

34.     PMA stated it had "no confidence or reasonable assurance" VNSFS could cure these items which, in effect, made clear PMA had elected to terminate the subcontract despite what VNSFS was able to accomplish during the ten-day cure period.

35.     PMA had no "confidence or assurance" because it deliberately structured the default notice in a way that made compliance impossible in one of four ways:

    a.   *Impossible Time Frame*: PMA understood the timeframe needed to provide complete correction of these issues and that ten days was not sufficient to accomplish a complete cure.  Many of these items were previously identified in the DOE findings and, therefore, were part of the Corrective Action Plan being prepared by PMA and VNSFS.  Such items were included on the PMA Recovery Schedule which showed an average completion duration of 214 days.

    b.   *PMA As Chokepoint*: One of the new items required the purchase of new hardware by PMA.  PMA was the only entity that could approve acquisitions of new equipment.  VNSFS previously made requests for PMA to purchase new hardware or software to address known issues but PMA refused to do so.  Thus, PMA, not VNSFS, controlled the ability of VNSFS to cure the new issue on the notice to cure.

    c.   *Restricting Customer Access*:  PMA prohibited VNSFS from contacting DOE even though some of these issues would require direct input from DOE.  For

example, PMA demanded VNSFS restore PMA's Continuous Authority to Operate (ATO) after it had been downgraded to a Fixed ATO. An ATO acts as permission by DOE for a contractor to operate an IT system that houses DOE information. A Continuous ATO does not have to be renewed. In contrast, a Fixed ATO is only valid for a fixed amount of time (usually 1 – 3 years). A contractor can operate an IT system under either form of ATO. Since an ATO can only be granted by DOE, it would likely be necessary for VNSFS to deal directly with DOE to cure this issue.

d. *Including Item Which PMA Already Agreed Was Not A Default* – One issue raised by DOE required the development of a process for self-assessments. VNSFS discussed this with PMA shortly after the DOE debrief review and PMA agreed this matter was not a default under the subcontract but it was a matter that needed to be addressed. In fact, PMA agreed that VNSFS would begin working on this process on May 1, 2019 and would have until August 30, 2019 to complete it.

36. At the time PMA issued the Notice, it knew VNSFS was already working on resolving these issues and issued the default notice in any event. VNSFS, in fact, was scheduled to provide VNSFS' proposed remedy on four of the items on Thursday, May 23 and then provide its solutions on additional items the week of May 27. VNSFS did, in fact, provide this information to PMA.

37. On May 22, 2019, PMA submitted to DOE the Corrective Action Plan that VNSFS helped prepare. VNSFS requested a copy of the Corrective Action Plan and PMA refused.

**VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTION – Page 8**

38.     In addition to knowingly creating impossible deadlines, PMA deliberately interfered with VNSFS' relationship with current employees by encouraging them to submit applications to either Leidos or PMA for their current VNSFS jobs:

    a.  On May 20, 2019, the day before PMA sent its default notice, Leidos began advertising job openings at the Piketon plant for positions such as cybersecurity manager and information technology manager. (Exh. D)

    b.  On May 22, 2019, PMA and its majority owner, North Wind, posted job openings for a records management document control clerk.  (Exh. F)

    c.  On May 30, 2019, PMA sent an email to VNSFS employees in the IT and cybersecurity sections providing a link to Leidos' website.  This link provided an application for "Incumbent Capture" or, in other words, a means for current VNSFS employees to be hired by Leidos. (Exh. G)

39.     Taken together, PMA's actions demonstrate that it pre-ordained the termination of VNSFS prior to ever providing the default notice in that:

    a.  PMA negotiated and apparently executed a subcontract with Leidos for the cybersecurity and IT scopes of work prior to notifying VNSFS of the alleged defaults.

    b.  Leidos began listing jobs currently held by VNSFS employees before the default notice was sent to VNSFS.

    c.  Before VNSFS had the opportunity to respond to the default notice, PMA listed jobs currently held by VNSFS employees and directly contacted VNSFS employees to encourage them to apply to Leidos for the positions they currently hold with VNSFS.

d. PMA issued the default notice knowing that VNSFS had been cooperating with PMA for over a month on developing a Corrective Action Plan and related schedule of activities.

e. PMA issued the default notice knowing that VNSFS had made progress on correcting the issues raised by DOE.

f. PMA constructed a ten-day cure period which it knew was impossible to meet since the timeframes set out in the PMA Recovery Schedule and, upon information and belief, the Corrective Action Plan, called for an average duration of 214 days to fully complete any remediation plan.

g. PMA included items which were out of VNSFS' ability to cure without specific action by PMA effectively allowing PMA to hold the cure process hostage.

h. PMA impeded the ability of VNSFS to cure the issues by prohibiting VNSFS the ability to contact DOE regarding VNSFS' cure activities.

i. PMA impeded the ability of VNSFS to cure the issues by denying VNSFS access to relevant information that could be of assistance in these ongoing efforts such as a copy of the Corrective Action Plan and the results from the review by PMA's third-party cybersecurity consultant.

j. PMA impeded the ability of VNSFS to cure the issues by prohibiting VNSFS' project manager and assistant project manager from being involved at all in managing the cure process.

k. PMA is attempting to terminate the entire contract despite the fact that the alleged defaults relate to a scope of work that represents no more than thirteen

percent of the contract value, only five out of VNSFS' thirty-three workers on the project, and there have been no complaints about VNSFS' performance of the unimpacted scopes of work.

40. On May 31, 2019, VNSFS submitted its response to PMA's default notice which, in part, outlined the status of the twelve items in the default notice. (Exh. H) Specifically, VNSFS noted by that date of the response:

a. VNSFS had completed the short-term cure milestone goals of 9 of 12 items either before the notice or in the ten-day cure period;

b. 1 of the 12 was moot by prior agreement with PMA;

c. 1 of the 12 (the ATO item) was both immaterial to PMA's performance because it does constitute a breach per the express contractual terms and, even if that were not true, it was impossible to perform by virtue of PMA's own direction not to contact DOE despite that issue's resolution requiring DOE to take action; and,

d. 1 of the 12 was moot by PMA's own failure to act (i.e., authorize a previously requested procurement).

41. In short, 75% of the alleged breaches had been cured—or were already cured before PMA's "notice of default"—and 25% of the alleged breaches are either moot or rendered impossible to cure by virtue of PMA's own conduct.

42. Despite VNSFS fully and complete response, on June 3, 2019 PMA informed VNSFS it would terminate the subcontract effective June 7, 2019. (Exh. I)

43. VNSFS' business is focused exclusively on the federal government market, generally, and projects at DOE complexes around the country, specifically. PMA and its

members, North Wind and Smith & Staley, are competitors in the DOE market.  VNSFS is constantly seeking new contracting opportunities with DOE directly and potential teaming partners.  VNSFS, for example, currently has three major proposals being reviewed by DOE and any Termination for Default would require notification to the contracting officers and seriously harm VNSFS's ability to win those contracts.

44.     A default termination, particularly a wrongful termination, would damage the business reputation of VNSFS.  VNSFS would be required to disclose such termination to potential teaming and contracting partners and, thereby cause it to lose business opportunities and revenue.  The amount of these losses is impossible to quantify and, therefore, cause irreparable harm to VNSFS.

45.     Conversely, in concocting an improper default termination of VNSFS, PMA and its members create an improper competitive advantage over VNSFS in the DOE marketplace by causing VNSFS to disclose this unsupported and wrongful termination.  Indeed, PMA's majority owner, North Wind, is a direct competitor on the largest of the three proposals currently under consideration by DOE.

46.     PMA's improper termination of VNSFS is not in the public's interest as it creates the possibility of disrupting the orderly operation of the DOE facility in Portsmouth since many of the services and programs performed under this subcontract are critical to the timely D&D cleanup of this site.  Many of these positions require specialized training and any disruption may impact those resources.  Finally, the D&D cleanup schedule has been communicated to the public and has regulatory milestones associated with it that this disruption could potentially impact.

## COUNT I:  DECLATORY JUDGMENT

47.     VNSFS restates and realleges the allegations contained in the preceding paragraphs by reference.

48.     An actual controversy exists between VNSFS, on the one hand, and PMA on the other as to whether PMA may terminate its subcontract with VNSFS.

49.     A declaratory judgment would terminate those controversies.

50.     Pursuant to 28 U.S.C. §2201, VNSFS hereby seeks a declaration from the Court that PMA has no right to terminate VNSFS from its subcontract with PMA.

## COUNT II:  PRELIMINARY AND PERMANENT INJUNCTION

51.     VNSFS restates and realleges the allegations contained in the preceding paragraphs by reference.

52.     PMA's attempt to terminate VNSFS for default constitutes a breach of the subcontract.

53.     Unless PMA is immediately restrained and enjoined, PMA will cause great and irreparable injury to VNSFS for which VNSFS has no adequate remedy at law.  There is a substantial likelihood of success on the merits of its declaratory judgment claim.  Moreover, the balance of equities tips in favor of VNSFS, and the public interest would be served by an injunction.

54.     VNSFS seeks a preliminary and permanent injunction barring PMA from terminating VNSFS' subcontract for issues raised in the DOE findings and that VNSFS be given a reasonable amount of time to finalize all work addressing issues raised by the DOE, which reasonable time should be measured by the schedule set forth in the PMA Recovery Schedule.

**WHEREFORE,** VNSFS prays for the following relief from this Court:

(1)     On Count I, a Declaration that PMA may not terminate VNSFS' subcontract based upon the issues raised by DOE in its April 2019 review;

(2)     On Count II, a preliminary and permanent injunction barring PMA from terminating VNSFS' subcontract for issues raised in the DOE findings and that VNSFS be given a reasonable amount of time to finalize all work addressing issues raised by the DOE, which reasonable time should be measured by the schedule set forth in the PMA Recovery Schedule.


Respectfully submitted,

 */s/ John A. Bailey*
John A. Bailey
HAWLEY TROXELL
412 West Center Street, Suite 2000
Pocatello, Idaho 83204
(208) 233-2001
jbailey@hawleytroxell.com

Stephen P. Withee (Ohio Bar No. 0069176)      John S. Higgins (Ohio Bar No. 0068156)
FROST BROWN TODD LLC                           FROST BROWN TODD LLC
10 West Broad Street, Suite 2300               3300 Great American Tower
Columbus, Ohio 43215-3467                      301 E. Fourth Street
(614) 559-7265                                 Cincinnati, OH 45202
swithee@fbtlaw.com                             (513) 651-6950
*Pro Hac Vice Application Pending*             jhiggins@fbtlaw.com
                                               *Pro Hac Vice Application Pending*

*Attorneys for Plaintiff VNS Federal Services, LLC*

## VERIFICATION OF COMPLAINT

I, Steven Moore, being duly cautioned and sworn, state that I am authorized to act as an claim agent of Plaintiff for the purpose of verifying the Complaint herein in accordance with the Federal Rules of Civil Procedure. To the extent I have personal knowledge of the matters alleged in the Complaint, the information is true and accurate to the best of my knowledge and belief. As to any matters for which I do not have personal knowledge, I am authorized by Plaintiff to state that Plaintiff is informed and believes that the allegations of the Complaint are true and accurate to the best of its knowledge and belief.

_____
Steven Moore

Subscribed to and sworn before me on this 4 day of June, 2019.

_____
Notary Public

Mrs. Eileen Kelly
Notary Public, State of Ohio
Commission Exp. 03-21-2022